## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 20-20615-CIV-MARTINEZ/AOR

MARILYN MATOS,

      Plaintiff,

v.

ANDREW SAUL,
Commissioner of Social Security,

      Defendant.

_____ /

### <u>REPORT AND RECOMMENDATION</u>

THIS CAUSE is before the Court upon Plaintiff Marilyn Matos's ("Claimant") Motion for Summary Judgment and Supporting Memorandum of Law (hereafter, "Claimant's Motion for Summary Judgment") [D.E. 19] and Defendant Andrew Saul, Commissioner of Social Security's ("Commissioner") Motion for Summary Judgment with Supporting Memorandum of Law and Opposition to Plaintiff's Motion for Summary Judgment (hereafter, "Commissioner's Motion for Summary Judgment") [D.E. 23]. Claimant filed a Response to Defendant's Motion for Summary Judgment/Reply to Defendant's Response to Plaintiff's Motion for Summary Judgment (hereafter, "Claimant's Reply") [D.E. 26]. The administrative transcript (hereafter, "TR.") has been filed [D.E. 14].[1] For the reasons stated below, the undersigned respectfully recommends that Claimant's Motion for Summary Judgment be DENIED, the Commissioner's Motion for Summary Judgment be GRANTED, and the Commissioner's decision be AFFIRMED.

---

[1] The references hereafter (TR. __) are to the transcript pages rather than the court record pages.

## PROCEDURAL HISTORY

Claimant filed an application for disability insurance benefits ("DIB") and an application for supplemental security income ("SSI") on April 19, 2017, alleging a disability onset date of August 5, 2016.  TR. 21, 300-306.  The application was denied initially and upon reconsideration. Id. at 21.  Upon Claimant's written request, a hearing was held on February 14, 2018, before Administrative Law Judge Tracey B. Leibowitz ("ALJ Leibowitz"), at which Claimant and Vocational Expert Theresa Salek ("VE Salek") testified.  Id. at 77-81.  At the hearing, Claimant's counsel stipulated that Claimant did not have any physical conditions that rose to the level of a severe medically determinable impairment, and that this was exclusively a psychiatric case.  Id. at 47-48.

On March 5, 2019, ALJ Leibowitz issued an Unfavorable Decision, finding the following:

(1) Claimant met the insured status requirements of the Social Security Act through June 30, 2021.  Id. at 23.

(2) Claimant had not engaged in substantial gainful activity since August 5, 2016, the alleged disability onset date (20 C.F.R. § 404.1571 et seq. and 416.971 et seq.).  Id.

(3) Claimant had the following severe impairments: major depressive disorder; co-dependent personality disorder; post-traumatic stress disorder ("PTSD"); schizoaffective disorder; and generalized anxiety disorder (20 C.F.R. §§ 404.1520(c) and 416.920(c)).  Id.

(4) Claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).  Id. at 24.[2]

(5) Claimant had the residual functional capacity (hereafter, "RFC") to perform a full range of work at all exertional levels, limited to: simple, routine, repetitive tasks but not at a production rate pace such as piece work or assembly line work;

---

[2] The Social Security Administration's ("SSA") Listing of Impairments "describes for each of the major body systems impairments that [the SSA] consider[s] to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience."  20 C.F.R. § 404.1525(a) and 416.925(a).

and occasional interactions with supervisors, coworkers, and the public (See SSR 16-3p and 20 C.F.R. §§ 404.1529 and 416.929). Id. at 27. [3]

(6) Claimant was capable of performing past relevant work as an office messenger. This work did not require the performance of work-related activities precluded by Claimant's RFC. (20 C.F.R. §§ 404.1565 and 416.965). Id. at 30.[4] Although Claimant was capable of performing past relevant work, there were other jobs existing in the national economy that she was also capable of performing. The ALJ made the following alternative findings:

    a. Claimant was born on January 16, 1965 and was 54 years old, which was defined as an individual closely approaching advanced age (20 C.F.R. §§ 404.1563 and 416.963). Id. at 31.

    b. Claimant had a limited education and was able to communicate in English (20 C.F.R. §§ 404.1564 and 416.964). Id.

    c. Transferability of job skills was not an issue in this case because Claimant's past relevant work was unskilled (20 C.F.R. §§ 404.1568 and 416.968). Id.

    d. In the alternative, considering Claimant's age, education, work experience, and RFC, there were other jobs that existed in significant numbers in the national economy that Claimant could perform (20 C.F.R. §§ 404.1569, 404.1569(a), 416.969 and 416.969(a)). Id.

(7) Claimant had not been under a disability, as defined in the Social Security Act, from August 5, 2016, through the date of the Unfavorable Decision (20 C.F.R. §§ 404.1520(f) and 416.920(f)). Id. at 32.

On January 30, 2020, the Appeals Council denied a request for review of ALJ Leibowitz's Unfavorable Decision. Id. at 1-5. On February 11, 2020, pursuant to 42 U.S.C. § 405(g), Claimant filed this action seeking reversal of ALJ Leibowitz's final administrative decision [D.E. 1].

In support of her contention that ALJ Leibowitz's Unfavorable Decision should be reversed, Claimant argues that:

---

[3] SSRs are a series of precedential decisions relating to the programs administrated by the SSA and are published under the authority of the Commissioner of Social Security. See http://ssa.gov/regulations/def-ssr.htm.

[4] "Past relevant work is work that you have done within the past 15 years, that was substantial gainful activity, and that lasted long enough for you to learn to do it." 20 C.F.R. §§ 404.1560(b)(1) and 416.960(b)(1).

I.      The ALJ failed to properly assess the opinion evidence of record.

II.     The ALJ's RFC finding was not supported by substantial evidence.

III.    The ALJ failed to properly assess Claimant's alleged symptoms and limitations.

See Claimant's Motion for Summary Judgment [D.E. 19].  The undersigned finds no merit in any of these contentions.

## RELEVANT MEDICAL EVIDENCE

### A. Treating Sources

#### 1) Palmetto General Hospital ("Palmetto")

Claimant presented to the Palmetto emergency room on July 26, 2016, complaining of feeling suicidal and being extremely depressed. Id. at 452. She stated that her depression started after her divorce 2 years before; that the symptoms had increased since; and that she had not been able to follow a psychiatric regimen due to her financial situation. Id. She stated that she took an antidepressant nightly. Id. at 455. Claimant was diagnosed with depressive disorder and was restarted on antidepressants and anxiolytics. Id. A brain CT scan was performed, and results were noted as essentially normal, with no changes compared to a previous examination of June 8, 2011. Id. at 456. She was discharged on July 29, 2016 with instructions to follow up with Citrus Health Network as an outpatient. Id. at 468.

Claimant was admitted at Palmetto again on September 6, 2016, complaining of suicidal ideation. Id. at 407. A review of systems was unremarkable; specifically, Claimant was oriented, with no headache, confusion, anxiety, or mania. Id. Claimant was diagnosed with depression with psychotic features. Id. at 411. It was noted that Claimant had a history of multiple admissions and of not taking her medications. Id. Claimant was discharged on September 9, 2016 with instructions to follow up with community mental health. Id. At the time of discharge, she was

oriented, her mood was sad, her affect was congruent, and her thought process was organized and goal directed.  Id.

### 2) Citrus Health Network ("Citrus")

Claimant received a psychiatric assessment at Citrus on August 5, 2016, from Alen Hidalgo, M.D. ("Dr. Hidalgo").  Id. at 470-73.  Claimant complained of depressed mood, anhedonia, low energy, overeating, weight gain, decreased concentration, crying spells, and isolation.  Id. at 470.  She admitted to passive suicidal ideation but denied that she would commit suicide; she denied being on psychotropic medications; she complained of flashbacks of sexual molestation from the time when she was a child, which made her irritable and anxious; she stated that she has had at least 3 panic attacks, and that she had sought hospitalization for the panic attacks.  Id.  Claimant stated that she had been prescribed an antidepressant, which worsened her symptoms, and that she discontinued it after the first day, but that she had been taking a sedative she had obtained through a neighbor.  Id.  She stated that she could not fill her prescription because she did not have money.  Id.  Claimant's mental status examination revealed that: she was casually dressed and had good hygiene; she was oriented to person, place, and time; her speech was normal, her thought process was logical and goal-oriented, and her judgement was intact; she appeared distressed and had crying spells; her mood was sad, depressed, and irritable; and she described intrusive thoughts.  Id.  Her attention, concentration, recent and remote memory, fund of knowledge, and abstraction were all rated as fair.  Id. at 472-73.  Claimant was motivated, verbal, and cooperative, but had poor coping skills.  Id. at 473.  She was diagnosed with major depressive disorder, generalized anxiety disorder, and possible PTSD, and prescribed a sedative and an antidepressant.  Id.  Claimant received an initial treatment plan which identified her problem as

recurrent major depression, evidenced by depressed mood, anhedonia, sleep difficulty, abnormal appetite, and lack of energy.  Id. at 491.

Claimant was seen at Citrus for a follow-up medication management visit by Diana De La Vega, M.D. ("Dr. De La Vega") on August 23, 2016.  Id. at 506.  Claimant reported compliance with the treatment plan and no side effects were noted.  Id.  Claimant's mental status examination revealed that: she was casually dressed and cooperative; her mood was depressed and anxious, with fair sleep and decreased daily functioning; she had panic attacks; she was not manic or agitated; and she had no abnormal movements.  Id.  She was advised to follow up with a primary care physician.  Id.

On September 15, 2016, Claimant followed up with Dr. De La Vega for medication management.  Id. at 505.  Claimant was taking an antidepressant and an antipsychotic drug and showed improvement of her illness, and she reported that she was feeling better.  Id.  Claimant was noted to be casually dressed with fair hygiene; verbal, not agitated, manic or suicidal; and motivated to get better.  Id.

On October 10, 2016, Claimant followed up with Dr. De La Vega for medication management.  Id. at 504.  Claimant reported compliance with the treatment plan with no side effects, and she stated that she felt less depressed but not functional.  Id.  Claimant's mental status examination revealed that: she was casually dressed and cooperative; her mood was depressed and anxious, with fair sleep and decreased daily functioning; she was not psychotic or manic; she stated that she had been diagnosed with bi-polar disorder in the past; and she was not manic or agitated.  Id.  Weight management was discussed, and Claimant was instructed to continue with the treatment plan and follow up with a primary care physician.  Id.

On October 14, 2016, Claimant saw Rafael Garcia, M.D. ("Dr. Garcia") at Citrus for follow up medication management. Id. at 503. Claimant reported: continued depression; feeling hopeless, helpless, and worthless; and having difficulties with sleep, and mood instability, with anxiety and panic attacks. Id. She denied suicidal ideas or plans; and Dr. Garcia noted that Claimant had gone more than 30 years without any suicidal attempts, making her suicide risk low. Id. Claimant's mental status examination revealed that: she was casually dressed, with good hygiene; she was not in acute distress; she was calm and her attitude was cooperative; she was oriented to person, place, and time; her eye contact was fair; her speech was normal; her mood was depressed; her affect was appropriate; her thought process was logical, goal oriented and unremarkable; she denied auditory, visual, and olfactory hallucinations and suicidal or homicidal ideas; her concentration, memory, abstraction, fund of knowledge, judgment, and insight were all rated as good. Id. Dr. Garcia adjusted her medication and discussed the importance of medication compliance and a healthy diet and daily exercise. Id.

On October 14, 2016, Claimant saw Natalie Randolph, Psy.D ("Dr. Randolph") at Citrus for a behavioral health follow-up visit. Id. at 565. Claimant reported anhedonia, anergia, depressed mood, poor appetite, insomnia, poor concentration, and fleeting thoughts of death with no plan or intent. Id. She also reported experiencing panic-like symptoms and feelings of choking during panic events. Id. Claimant was fully orientated and did not appear to be in acute distress; she was casually dressed with good hygiene and appropriate eye contact and speech. Id. Claimant's mood was labile with full range of affective expression; she was tearful and often crying during the session. Id. Her attention and concentration were good; her thought content was unremarkable; her thought process was logical; and she showed no signs of perceptual disturbances. Id. Her judgment and insight were fair; and she showed no signs of suicidality or

homicidality.  Id.  She reported compliance with medication but stated that the medication was not effective.  Id.  She denied any other symptoms of depression or anxiety, denied aggressive or impulsive tendencies, and denied barriers to treatment or physical illness.  Id.

On October 18, 2016, Claimant saw Dr. Randolph again for a behavioral health status examination.  Id. at 560-64.  Dr. Randolph noted that Claimant was diagnosed with major depressive disorder, severe, recurrent episode, with anxious distress.  Id. at 560.  Claimant showed symptoms of anhedonia, anergia, depressed mood, poor appetite, insomnia, poor concentration, and fleeting thoughts of death with no plan or intent.  Id.  Claimant reported history of distinct periods of decreased need for sleep, flights of ideas, and distractibility lasting for several days, and experiencing panic-like symptoms including tachycardia and shortness of breath.  Id.  Claimant also reported auditory and tactile hallucinations on occasion.  Id.  She stated that her symptoms were causing her significant distress.  Id. at 561.  She denied any other symptoms of depression or anxiety, denied aggressive or impulsive tendencies, and denied barriers to treatment or physical illness.  Id.  Claimant reported a history of suicide attempts at age 8 and age 14 and making superficial cuts on her wrist when she was in her thirties, but she had had no suicide attempts in the past twenty years.  Id.  Claimant had a medical history of colonic polyps; she denied any new physical symptoms, recent surgeries, or taking any medications for medical conditions.  Id.  Claimant's mental status examination revealed that: she was casually dressed with good hygiene; she was cooperative and a reliable historian; her speech was verbose and she was fully oriented; her attention/concentration, insight, and judgment were fair; her recent memory was fair and her remote memory was good; her mood was labile; her affect was a full range of expression; her thought process was logical and she showed no signs of perceptual disturbances; and she did not appear to be in any acute distress.  Id. at 562-63.  She was diagnosed with bipolar disorder, most

recent episode depressed with anxious distress, and panic disorder without agoraphobia.  Id. at 563.  Dr. Randolph recommended that Claimant receive individual psychotherapy and referred her to a nutritionist for obesity.  Id.

On October 25, 2016, Claimant saw Dr. Randolph for an individual therapy session.  Id. at 559.  Claimant was fully oriented and did not appear to be in any acute distress; she was casually dressed and had good hygiene; her eye contact and speech were normal; her attention, concentration, judgment, and insight were fair; her thought content was unremarkable; her thought process was concrete; and she had no perceptual disturbances or suicidality/homicidality.  Id.

On October 28, 2016, Claimant saw Yunelis Vera, Psy.D ("Dr. Vera") at Citrus, for a behavioral health follow-up visit.  Id. at 557.  Claimant's symptoms included anhedonia, depressed mood, increased appetite, and, at times, poor concentration, lack of energy, and psychomotor retardation.  Id.  Claimant reported thoughts of death but denied any suicidal ideation, plan or intent.  Id.  Claimant reported distractibility, nervousness, restlessness, worries, and irritability, and also reported a history of panic attacks that felt like someone was choking her.  Id.  Claimant was fully oriented, appropriately dressed with good hygiene, and did not appear to be in acute distress.  Id.  Her speech, eye contact, attention, thought content, thought process, and concentration were all appropriate/unremarkable.  Id.  Her judgment and insight were intact, and she had no signs of suicidality or homicidality.  Id.

On November 15, 2016, Claimant began seeing Dhizarah Matus de la Parra, MD ("Dr. Matus de la Parra") at Citrus for medication management, after Claimant requested to switch providers.  Id. at 502.  Claimant reported less sadness and anhedonia with medication and less mood instability.  Id.  Claimant's mental status examination revealed that: she was oriented to person, place, and time; she was calm and well groomed; her speech, mood, affect, and thought

process were good/appropriate; she denied auditory or visual hallucinations and was not delusional; and she denied suicidal or homicidal ideations, intent, or plan. Id. She was diagnosed with major depressive disorder, generalized anxiety disorder, rule-out personality disorder, and obstructive sleep apnea. Id. Dr. Matus de la Parra adjusted her medication and discussed the risks and benefits and side effects of medication and the importance of follow-up medication monitoring. Id.

On December 12, 2016, Claimant followed up with Dr. Matus de la Parra for medication management. Id. at 501. Claimant reported irritability, not being able to sleep, feeling depressed, and lack of motivation. Id. Claimant's mental status examination revealed that: she was oriented to person, place, and time; she was calm and well groomed; her speech, affect, and thought process were good/appropriate; her mood was "not sleeping"; she denied auditory or visual hallucinations and was not delusional; and she denied suicidal or homicidal ideations, intent, or plan. Id. She was diagnosed with major depressive disorder, generalized anxiety disorder, rule-out personality disorder, rule-out bipolar disorder, and obstructive sleep apnea. Id. Dr. Matus de la Parra adjusted her medication and discussed the risks and benefits and side effects of medication. Id.

On January 10, 2017, Claimant followed up with Dr. Matus de la Parra for medication management. Id. at 500. Claimant reported feeling well overall, and that she was sleeping well again and had less irritability and depressed mood. Id. She reported going to the hospital for gastrointestinal pain, and that testing results were within normal limited; no other concerns were reported. Id. Claimant's mental status examination revealed that: she was oriented to person, place, and time; she was calm and well groomed; her speech, affect, and thought process were good/appropriate; her mood was "ok"; she denied auditory or visual hallucinations and was not delusional; and she denied suicidal or homicidal ideations, intent, or plan. Id. She was diagnosed

with major depressive disorder, generalized anxiety disorder, rule-out personality disorder, rule-out bipolar disorder, and obstructive sleep apnea.  Id.  Dr. Matus de la Parra advised her to continue her current medications.  Id.

On January 24, 2017, Claimant underwent a psychosocial evaluation by Enrique Dejesus Vazquez, LMHC ("Mr. Vazquez") to determine eligibility for program services.  Id. at 474-478. Claimant reported that she suffered from depression, felt sad, hopeless, had low energy, and increased appetite and overeating, with poor concentration, crying spells, isolating from others, and not caring about her hygiene, and lying in bed for most of the day with anxiety, irritability, low frustration tolerance, with explosive verbal outbursts.  Id.  at 474.  She stated that she had smoked every day for 20 years; that she had finished 12th grade and studied cosmetology, English, and computer management; and that she lived with her parents and her 15-year-old son.  Id. at 475. Claimant's mental status examination revealed that: she was casually dressed and cooperative; she was oriented to person, place, and time; her speech was pressured; her thought process was circumstantial; her judgment was intact; her mood was depressed; her affect was constricted; and she showed no signs of potential for harm to herself or others.  Id. at 477.  Her attention and concentration, recent and remote memory, fund of knowledge, and calculations and abstraction were all rated fair.  Id.  Claimant was diagnosed with major depressive disorder, generalized anxiety disorder, hypertension, and rule-out PTSD.  Id.  Claimant received a master treatment plan, which identified her problems as depressive symptoms, anxiety, and decline in basic activities of daily living; and indicated her willingness to participate in the plan.  Id. at 484-489.  Claimant met the criteria for community support services and was admitted to receive services at Behavioral Mental Health Day Services for two hours per day.  Id. at 485.

On February 7, 2017, Claimant followed up with Dr. Matus de la Parra for medication management.  Id. at 499.  Claimant reported feeling well overall; she restarted a skills day treatment program that was beneficial, and she was sleeping better and felt less irritable, but reported feeling sad about not being paid child support.  Id.  Claimant's mental status examination revealed that: she was oriented to person, place, and time; she was calm and well groomed; her speech and her thought process were good/appropriate; her mood was "so-so"; her affect was sad; she denied auditory or visual hallucinations and was not delusional; and she denied suicidal or homicidal ideations, intent, or plan.  Id.  She was diagnosed with major depressive disorder, generalized anxiety disorder, rule-out personality disorder, rule-out bipolar disorder, obstructive sleep apnea, hypertension, gastritis, and hyperlipidemia.  Id.  Dr. Matus de la Parra advised her to continue her current medications.  Id.

On March 7, 2017, Claimant followed up with Dr. Matus de la Parra for medication management. Id. at 498.  Claimant reported that she was compliant with her medications, and that she had been attending the skills day treatment program; she reported having hallucinations which she had not expressed before.  Specifically, she reported seeing shadows and talking to people who had passed away.  Id.  She denied drug use.  Id.  She reported that arguments with her mother and the fact that she had not been paid child support were stressors.  Id.  She became irritable, easily defensive, and impulsive.  Id.  Claimant's mental status examination revealed that: she was oriented to person, place, and time; she was calm and well groomed; her speech and her thought process were good/appropriate; her mood was "not good"; her affect was sad and depressed; she denied auditory or visual hallucinations and was not delusional; and she denied suicidal or homicidal ideations, intent, or plan.  Id.  Dr. Matus de la Parra adjusted her medications.  Id.

On March 17, 2017, Claimant received an addendum to her master treatment plan, which increased the frequency of her Behavioral Mental Health Day Services to four hours per day. Id. at 480.

On April 4, 2017, Claimant followed up with Dr. Matus de la Parra for medication management. Id. at 497. Claimant reported that she was feeling less anxious and irritable, and better overall. Id. She also reported less perceptual disturbances. Id. She stated that she wanted to apply for disability because she did not feel capable of working. Id. Claimant's mental status examination revealed that: she was oriented to person, place, and time; she was calm and well groomed; her speech and her thought process were good/appropriate; her mood was "ok"; her affect was depressed; she denied auditory or visual hallucinations and was not delusional; and she denied suicidal or homicidal ideations, intent, or plan. Id. Dr. Matus de la Parra advised her to continue with current medications and referred her to individual psychotherapy. Id.

On May 2, 2017, Claimant followed up with Dr. Matus de la Parra for medication management. Id. at 496. Claimant reported that she was feeling less irritable and that she was sleeping well, with no paralysis episodes. Id. Claimant's mental status examination revealed that: she was oriented to person, place, and time; she had no abnormal involuntary movements; her speech and her thought process were good/appropriate; her mood was "ok"; her affect was depressed; she denied auditory or visual hallucinations and was not delusional; and she denied suicidal or homicidal ideations, intent, or plan. Id. Dr. Matus de la Parra advised her to continue with current medications and referred her to individual psychotherapy. Id.

On June 23, 2017, Claimant met with Helena Martinez, Psy.D ("Dr. Martinez") at Citrus for an initial individual therapy session. Id. at 642. Claimant's diagnosis was noted as major depressive disorder, recurrent episode with anxious distress, generalized anxiety disorder, and

PTSD.  Id.  Claimant reported that she had been at Palmetto due to auditory hallucinations telling her to kill herself; she also reported conflicts with her mother and that she was impacted by loss of finances.  Id.  Claimant stated that: she was feeling better; she had depression, anxiety, and mood swings; she slept  with the aid of medication; she suffered from forgetfulness; she was easily overwhelmed and irritated; she was unable to be in large crowds; she had more appetite and weight gain; and sometimes she felt helpless, hopeless, and had passive thoughts of dying.  Id.  She denied suicidal or homicidal ideations, intent, or plan or any perceptual disturbances.  Id.   Claimant's mental status examination revealed that: her mood was depressed, tearful at times; her affect was congruent; she was oriented to person, place, and time; she was organized, coherent, open, and cooperative; she had good eye contact; she was well dressed; she had good hygiene and grooming; her judgment and insight were adequate; she had no psychosis, and no suicidality or homocidality.  Id.   Claimant's master treatment plan was reviewed and updated to add individual therapy.  Id. at 643-647.

On June 28, 2017, Claimant followed up with Dr. Matus de la Parra for medication management.  Id. at 637.  Claimant reported that she had been compliant with her medications, and that she had had periods of sleep paralysis.  Id.  She reported an improved mood with antipsychotic medication.  Id.  Claimant's mental status examination revealed that: she was oriented to person, place, and time; she had no abnormal involuntary movements; her speech and her thought process were good/appropriate; her mood was "better"; her affect was reactive; she denied auditory or visual hallucinations; and she denied suicidal or homicidal ideations, intent, or plan.  Id.  Dr. Matus de la Parra adjusted her medications.  Id.

On July 27, 2017, Claimant saw Dr. Martinez for individual therapy.  Id. at 639.  Claimant reported that: she was feeling ok; she was depressed because she was denied benefits and has been

anxious; she was overeating without noticing and had gained weight; she was irritable; her children were supportive; she was getting along better with her mother; she had previously suffered domestic violence; she sometimes slept for days, but some days she was less depressed than others. Id. Claimant's mental status examination revealed that: her mood was depressed, tearful at times; her affect was congruent; she was oriented to person, place, and time; she was organized, coherent, open, and cooperative; she had good eye contact; she was well dressed; she had good hygiene and grooming; her judgment and insight were adequate; and she had no psychosis, and no suicidality or homocidality. Id.

On August 10, 2017, Claimant saw Dr. Martinez for individual therapy. Id. at 638. Claimant reported that: she was feeling highs and lows; she was less depressed; she still overate without noticing, she was less irritable; she got along better with her mother who now acknowledged her condition was real. Id. Claimant's mental status examination revealed that: her mood was depressed, tearful at times; her affect was congruent; she was oriented to person, place, and time; she was organized, coherent, open, and cooperative; she had good eye contact; she was well dressed; she had good hygiene and grooming; her judgment and insight were adequate; and she had no psychosis, and no suicidality or homocidality. Id.

On August 23, 2017, Claimant followed up with Dr. Matus de la Parra for medication management. Id. at 675. Claimant reported feeling more stable with her medication, and less irritable and less depressed. Id. She also reported sleeping well. Id. Claimant's mental status examination revealed that: she was oriented to person, place, and time; she had no tremors or abnormal involuntary movements; her speech was regular; her mood was "better"; her affect was reactive; her thought process was organized; she denied auditory or visual hallucinations; and she

denied suicidal or homicidal ideations, intent, or plan.  Id.  Dr. Matus de la Parra adjusted her medications.  Id.

 On August 24, 2017, Claimant saw Dr. Martinez for individual therapy.  Id. at 674. Claimant reported that: she was having mood swings; she had suffered two falls; and she was less irritable and getting along better with her mother.  Id.  Claimant's mental status examination revealed that: her mood was depressed, tearful at times; her affect was congruent; she was oriented to person, place, and time; she was organized, coherent, open, and cooperative; she had good eye contact; she was well dressed; she had good hygiene and grooming; her judgment and insight were adequate; and she had no psychosis, and no suicidality or homicidality.  Id.  Dr. Martinez reinforced the use of breathing exercises and muscle relaxation techniques.  Id.

 On October 12, 2017, Claimant saw Dr. Martinez for individual therapy.  Id. at 673. Claimant reported that: she was feeling down and depressed; she had mood swings; she was not sleeping well; and she was anxious.  Id.  She also reported having gone on a family weekend cruise for her father's birthday, which she enjoyed.  Id.  Claimant's mental status examination revealed that: her mood was depressed; her affect was congruent; she was oriented to person, place, and time; she was organized, coherent, open, and cooperative; she had good eye contact; she was well dressed; she had good hygiene and grooming; her judgment and insight were adequate; and she had no psychosis, and no suicidality or homicidality.  Id.  Dr. Martinez reinforced the use of breathing exercises.  Id.

 On October 18, 2017, Claimant followed up with Dr. Matus de la Parra for medication management.  Id. at 672.  Claimant reported that she felt sad, depressed, and anxious, and was not cleaning like she used to.  Id.  She also reported sleeping well.  Id.  Claimant reported that she had been admitted to the hospital in May of 2017 for fighting with her father, and was given a diagnosis

of bipolar disorder depressed type, and schizoaffective disorder.  Id.  Claimant's mental status examination revealed that: she was oriented to person, place, and time; she had no tremors or abnormal involuntary movements; her speech was good; her mood was "ok"; her affect was reactive; her thought process was organized; she denied auditory or visual hallucinations; and she denied suicidal or homicidal ideations, intent, or plan.  Id.  Dr. Matus de la Parra advised Claimant to continue her current medications.  Id.

On October 26, 2017, Claimant saw Dr. Martinez for individual therapy.  Id. at 671. Claimant reported that: she was feeling down and depressed, but had experienced a hyper episode during which she felt happy for about a week, then became depressed again.  Id.  She also reported having gone to a family dinner to celebrate her sister's birthday.  Id.  She stated that her mother was a trigger.  Id.  Claimant's mental status examination revealed that: her mood was depressed; her affect was congruent; she was oriented to person, place, and time; she was organized, coherent, open, and cooperative; she had good eye contact; she was well dressed; she had good hygiene and grooming; her judgment and insight were adequate; and she had no psychosis, and no suicidality or homicidality.  Id.  Dr. Martinez reinforced the use of breathing exercises.  Id.

On November 9, 2017, Claimant saw Dr. Martinez for individual therapy.  Id. at 670. Claimant reported that she was feeling down and depressed after finding out that her son was gay, and that she was anxious and not sleeping well.  Id.  Claimant's mental status examination revealed that: her mood was depressed; her affect was congruent; she was oriented to person, place, and time; she was organized, coherent, open, and cooperative; she had good eye contact; she was well dressed; she had good hygiene and grooming; her judgment and insight were adequate; and she had no psychosis, and no suicidality or homicidality.  Id.

On November 16, 2017, Claimant followed up with Dr. Matus de la Parra for medication management.  Id. at 669.  Claimant reported feeling "ok", but worried because she had found out her son was gay.  Id.  She also reported having some days where she felt anxious and depressed but that she was sleeping well.  Id.  She denied medication side effects.  Id.  Claimant's mental status examination revealed that: she was oriented to person, place, and time; she was casually dressed; she had no tremors or abnormal movements; her mood was "ok" and her affect was depressed; her thought process was organized; she denied auditory or visual hallucinations; and she denied suicidal or homicidal ideations, intent, or plan.  Id.  Dr. Matus de la Parra advised to continue taking her current medication.  Id.

 On December 13, 2017, Claimant followed up with Dr. Matus de la Parra for medication management.  Id. at 668.  She was diagnosed with bipolar disorder, depressed type.  Id.  Claimant reported feeling depressed, having trouble sleeping, and becoming easily irritable.  Id.  She also reported that she was planning to spend the holidays with family.  Id.  She denied medication side effects or acute medical complaints.  Id.  Claimant's mental status examination revealed that: she was oriented to person, place, and time; she was casually dressed; she had no tremors or abnormal movements; her mood was depressed and her affect was blunted; her thought process was organized; she denied auditory or visual hallucinations; and she denied suicidal or homicidal ideations, intent, or plan.  Id.  Dr. Matus de la Parra adjusted Claimant's antipsychotic and antidepressant medication.  Id.

On December 14, 2017, Claimant saw Mr. Vazquez for a treatment plan review.  Id. at 667. Claimant reported that she continued having feelings of sadness and hopelessness, frequent crying spells, anhedonia, sleep difficulty, lack of energy, shortness of breath, palpitations, sweaty palms and soles, overeating, lack of desire to accomplish household chores, decline in self-care, difficulty

maintaining her living environment tidy, and a tendency to isolate from others.  Id.  She continued to meet the criteria for community support services.  Id.

On January 23, 2018, Claimant followed up with Dr. Matus de la Parra for medication management.  Id. at 712.  She was diagnosed with bipolar disorder, depressed type.  Id.  Claimant reported less depression and panic-like symptoms and stated that the medications were helping control her angry outbursts and irritability.  Id.  She denied any side effects from the medications. Id.  Claimant's mental status examination revealed that: she was oriented to person, place, and time; she was casually dressed; she had no abnormal movements; her mood was depressed and her affect was blunted; her thought process was organized; she denied auditory or visual hallucinations; and she denied suicidal or homicidal ideations, intent, or plan.  Id.  Dr. Matus de la Parra advised her to continue her current medications.  Id.

On January 29, 2018, Claimant saw Dr. Martinez for individual therapy.  Id. at 715. Claimant reported mood swings and stated that she had gone to New York for the New Year and had forgotten her medication.  Id.  Claimant's mental status examination revealed that: she was oriented to person, place, and time; she was well dressed and her hygiene and grooming were good; her mood was depressed and her affect was congruent; she was organized, coherent, open, and cooperative; her judgment and insight were adequate; she had good eye contact; and she had no psychosis, homicidality or suicidality.  Id.

On February 12, 2018, when Claimant saw Dr. Martinez for a termination session, she reported that her mood swings were about the same, that she was aware of when she became irritable and depressed and isolated, and that she has having a hard time falling asleep.  Id. at 724. Claimant's mental status examination revealed that: her mood was depressed; her affect was congruent; she was oriented to person, place, and time; she was well dressed and her hygiene and

grooming were good; she was organized, coherent, open, and cooperative; her judgment and insight were adequate; she had good eye contact; and she had no psychosis, homicidality or suicidality. Id. Dr. Martinez reinforced the use of breathing exercises and relaxation. Id.

On February 20, 2018, Claimant followed up with Dr. Matus de la Parra for medication management. Id. at 742. Claimant reported that she was less moody and irritable, and that her mood swings had decreased; and she denied any panic symptoms. Id. Claimant's mental status examination revealed that: she was oriented to person, place, and time; she was casually dressed; she had no abnormal movements; her mood was "worried"; her affect was depressed; her thought process was organized; she denied auditory or visual hallucinations; and she denied suicidal or homicidal ideations, intent, or plan. Id. She was diagnosed with bipolar disorder, depressed type. Id. Dr. Matus de la Parra advised her to continue her current medications. Id.

On March 13, 2018, Claimant received an addendum to her treatment plan, discharging her from individual therapy. Id. at 758. Her diagnosis was noted as major depressive disorder, generalized anxiety disorder, and rule out PTSD. Id.

On March 20, 2018, Claimant followed up with Dr. Matus de la Parra for medication management. Id. at 763. She reported feeling "ok" with medications. Id. She also reported difficulty falling asleep and shortness of breath, but that she was less irritable and depressed. Id. Claimant's mental status examination revealed that: she was oriented to person, place, and time; she was casually dressed; she had no abnormal movements; her mood was depressed and her affect was blunted; her thought process was organized; she denied auditory or visual hallucinations; and she denied suicidal or homicidal ideations, intent, or plan. Id. Dr. Matus de la Parra advised her to continue her current medications. Id.

20

On April 12, 2018, Claimant met with Mr. Vazquez to review and revise her treatment plan. Id. at 758-780. Claimant reported feelings of sadness and hopelessness, frequent crying spells, anhedonia, sleep difficult, lack of energy and desire to accomplish household chore, decline in self-care activities, difficulty maintaining a tidy living environment, and tendency to isolate from others. Id. at 780. Claimant continued to meet the criteria for community support services, and her treatment plan was stepped down from behavioral mental health day services to psychosocial rehabilitation services. Id.

On April 25, 2018, Claimant followed up with Dr. Matus de la Parra for medication management. Id. at 781. She reported feeling better and denied changes in her mood or behavior. Id. She also reported difficulty falling asleep and shortness of breath, but that she was less irritable and depressed. Id. Claimant's mental status examination revealed that: she was oriented to person, place, and time; she was casually dressed; she had no abnormal movements; her mood was depressed and her affect was blunted; her thought process was organized; she denied auditory or visual hallucinations; and she denied suicidal or homicidal ideations, intent, or plan. Id. Dr. Matus de la Parra advised her to continue her current medications. Id.

On May 30, 2018, Claimant followed up with Dr. Matus de la Parra for medication management. Id. at 782. She reported getting along with her mother, but feeling depressed, sad, crying for no reason, and unmotivated and not interested in going out with family or friends. Id. She denied racing thought, irritability, or medication side effects. Id. Claimant's mental status examination revealed that: she was oriented to person, place, and time; she was casually dressed; she had no abnormal movements; her mood was depressed and her affect was congruent; her thought process was organized; she denied auditory or visual hallucinations; and she denied

suicidal or homicidal ideations, intent, or plan.  Id.  Dr. Matus de la Parra adjusted Claimant's medications.  Id.

On July 10, 2018, Claimant followed up with Dr. Matus de la Parra for medication management.  Id. at 783.  She had run out of her prescribed antidepressant.  Id.  She reported having experienced a panic attack while eating with her family.  Id.  She also reported that she would be traveling to Sarasota with her family.  Id.  Claimant's mental status examination revealed that: she was oriented to person, place, and time; she was casually dressed; she had no abnormal movements; her mood was "I had a panic attack" and her affect was congruent; her thought process was organized; she denied auditory or visual hallucinations; and she denied suicidal or homicidal ideations, intent, or plan.  Id.  Dr. Matus de la Parra advised her to restart her antidepressant medication and continue her other medications.  Id.

On August 9, 2018, Claimant followed up with Dr. Matus de la Parra for medication management.  Id. at 784.  She reported having an improved mood, and that she felt less depressed and anxious and was able to relax more.  Id.  She denied panic symptoms and reported that she was sleeping well.  Id.  She had recently gone to see family in Sarasota.  Id.  Claimant's mental status examination revealed that: she was oriented to person, place, and time; she was casually dressed; she had no abnormal movements; her mood was better and her affect was congruent; her thought process was organized; she denied auditory or visual hallucinations; and she denied suicidal or homicidal ideations, intent, or plan.  Id.  Dr. Matus de la Parra advised Claimant to continue her current medications.  Id.

On September 10, 2018, Claimant followed up with Dr. Matus de la Parra for medication management.  Id. at 787.  She reported weight loss, an improved mood, feeling more positive, and that spending time with family helped her feel better.  Id.  She reported no mood swings or

medication side effects and stated that she was sleeping better.  <u>Id.</u>  Claimant's mental status examination revealed that: she was oriented to person, place, and time; she was casually dressed; she had no abnormal movements; her mood was "" and her affect was congruent; her thought process was organized; she denied auditory or visual hallucinations; and she denied suicidal or homicidal ideations, intent, or plan.  <u>Id.</u>  Dr. Matus de la Parra advised Claimant to continue her current medications.  <u>Id.</u>

On November 12, 2018, Dr. Matus de la Parra completed a Medical Source Statement of Ability to do Work-Related Activities (Mental) ("Medical Source Statement").  <u>Id.</u> at 792-793. Dr. Matus de la Parra opined that Claimant's ability to follow work rules and use of judgment was fair; her ability to relate to co-workers, interact with supervisors, function independently, and maintain attention and concentration was poor; and she had no ability to deal with the public or deal with work stress.  <u>Id.</u> at 792.  Dr. Matus de la Parra further opined that Claimant: had difficulties dealing with daily challenges, which might affect her work functioning; was likely to become confused and disorganized under stress; had poor self-confidence; and would likely give up easily when confronted with problems in the workplace.  <u>Id.</u>  Dr. Matus de la Parra further opined that Claimant's impairments impacted her ability to understand, remember, and carry out instructions; that her ability to understand and remember short simple instructions was fair; and that her ability to understand and remember detailed job instructions or complex job instructions was poor. <u>Id.</u> at 793.  Dr. Matus de la Parra further opined that Claimant's emotional state affected her concentration; that she would need frequent prompts and assistance to sustain her work concentration; and that she might have difficulty maintaining an adequate level of job performance in pressure situations where there were rapid changes in routine and job responsibilities.  <u>Id.</u>  Dr. Matus de la Parra further opined that Claimant's ability to maintain her personal appearance was

fair; and that her ability to behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability were poor. <u>Id.</u> at 793. Dr. Matus de la Parra further opined that Claimant was very anxious and prone to worry, that her level of anxiety impacted her functioning significantly and that, as a result, she would not relate predictably in social situations, which would affect her reliability; that life stressors made Claimant moody and irritable; that she was easy frustrated and overwhelmed; and that the suffered from mood swings, depression, lack of motivation and energy, emotional dysregulation and ruminations which would affect her work performance. <u>Id.</u> Dr. Matus de la Parra noted that Claimant could manage benefits in her own best interest. <u>Id.</u>

### B. Non-treating Sources

#### 1) State Agency Psychological Consultant Val Bee, Psy.D ("Dr. Bee")

On July 19, 2017, Dr. Bee completed a Psychiatric Review Technique ("PRT") and a Mental RFC Assessment for Claimant. <u>Id.</u> at 141-146. Dr. Bee opined that Claimant had: no difficulties in understanding, remembering, or applying information, or in adapting or managing herself; and moderate difficulties in interacting with others, and in concentration, persistence, and maintaining pace. <u>Id.</u> at 141. Dr. Bee further opined that the totality of the evidence supported the conclusion that Claimant's medically determinable impairments were severe, but there was no persuasive evidence that the intensity, persistence, and limiting effects of these symptoms would prohibit the Claimant from performing simple work activities. <u>Id.</u> at 144.

Dr. Bee opined that Claimant had no limitations with regard to understanding and memory. <u>Id.</u> at 145. Dr. Bee further opined that Claimant had the following limitations with regard to concentration and persistence: Claimant was not significantly limited in her ability to carry out very short and simple instructions, to perform activities within a schedule, to maintain regular

attendance, to be punctual within customary tolerances, to sustain an ordinary routine without special supervision, and to make simple work-related decisions; Claimant was moderately limited in her ability to carry out detailed instructions, to maintain attention and concentration for extended periods, to work in coordination with others without being distracted by them, to complete a normal workday and workweek without interruptions from psychologically based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods.  Id. at 144-45.  Dr. Bee opined that Claimant had multiple mental diagnosis that would likely interfere with her ability to work complex jobs; however, she was capable of simple, routine tasks.  Id. 145.

Dr. Bee further opined that Claimant had the following social limitations: she was not significantly limited in her ability to ask simple questions or request assistance, to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; and she was moderately limited in her ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, to interact appropriately with the general public, and to accept instruction and respond appropriately to criticism from supervisors.  Id. at 146.  Dr. Bee opined that Claimant had multiple mental diagnosis that would likely interfere with her ability to perform tasks with frequent interaction demands; however, she could persist in a role that required only limited and superficial social involvement.  Id.

Dr. Bee further opined that Claimant had the following adaptation limitations: she was not significantly limited in her ability to respond appropriately to changes in the work setting, to be aware of normal hazards and take appropriate precautions, and to travel in unfamiliar places or use public transportation; and she was moderately limited in her ability to set realistic goals or to make plans independently of others.  Id. at 146.  Dr. Bee opined that Claimant's daily adaptive skills were largely preserved, but she might need support with planning and goal setting.  Id.

Dr. Bee further opined that Claimant could understand, retain, and carry out simple and some complex instructions, should be capable of attention and concentration on at least simple, routine tasks for at least two hours at a time, would require reasonable, but not frequent breaks throughout the day, and was able to perform activities within a schedule, maintain regular attendance, and be punctual with customary tolerances.  Id.

### 2) State Agency Psychological Consultant Michael Plasay, Ph.D. ("Dr. Plasay")

On October 5, 2017, Dr. Plasay completed a Psychiatric Review Technique ("PRT") and a Mental RFC Assessment for Claimant.  Id. at 175-181.  Dr. Plasay opined that Claimant had: no difficulties in understanding, remembering, or applying information; and moderate difficulties in interacting with others, in concentration, persistence, and maintaining pace, and in adapting or managing herself.  Id. at 176.

Dr. Plasay opined that Claimant had no limitations with regard to understanding and memory.  Id. at 179.  Dr. Plasay further opined that Claimant had the following limitations with regard to concentration and persistence: Claimant was not significantly limited in her ability to carry out very short and simple instructions, to perform activities within a schedule, to maintain regular attendance, to be punctual within customary tolerances, to sustain an ordinary routine without special supervision, and to make simple work-related decisions; Claimant was moderately limited in her ability to carry out detailed instructions, to maintain attention and concentration for extended periods, to work in coordination with others without being distracted by them, to complete a normal workday and workweek without interruptions from psychologically based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods.  Id. at 179-80.  Dr. Plasay opined that Claimant had multiple mental diagnosis that would

likely interfere with her ability to work complex jobs; however, she was capable of simple, routine tasks.  Id. 180.

Dr. Plasay further opined that Claimant had the following social limitations: she was not significantly limited in her ability to ask simple questions or request assistance, to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; and she was moderately limited in her ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, to interact appropriately with the general public, and to accept instruction and respond appropriately to criticism from supervisors.  Id. at 180.  Dr. Plasay opined that Claimant had multiple mental diagnosis that would likely interfere with her ability to perform tasks with frequent interaction demands; however, she could persist in a role that required only limited and superficial social involvement.  Id.

Dr. Plasay further opined that Claimant had the following adaptation limitations: she was not significantly limited in her ability to respond appropriately to changes in the work setting, to be aware of normal hazards and take appropriate precautions, and to travel in unfamiliar places or use public transportation; and she was moderately limited in her ability to set realistic goals or make plans independently of others.  Id. at 181.  Dr. Plasay opined that Claimant's daily adaptive skills were largely preserved, but she might need support with planning and goal setting.  Id.

Dr. Plasay further opined that Claimant could understand, retain, and carry out simple and some complex instructions, should be capable of attention and concentration on at least simple, routine tasks for at least two hours at a time, would require reasonable, but not frequent breaks throughout the day, and was able to perform activities within a schedule, maintain regular attendance, and be punctual with customary tolerances.  Id.

## **FUNCTION REPORT**

On May 1, 2017, Claimant completed a function report in which she stated she was forgetful, nervous, and suffered from panic attacks and depression.  Id. at 340.  She stated that, on a typical day, she prepared her son for school, then she attended a group therapy program, and afterward she went home to write or read a book before preparing dinner and going to sleep.  Id. at 341.  She stated that she took care of her son and prepared breakfast, lunch, and dinner for him. Id.  She stated that she used to have good memory and concentration; that she could not sleep well due to insomnia and sleep paralysis; that she did not care about how she looked, and that she sometimes did not shower.  Id.  She stated that she needed to make notes as reminders to take care of personal needs and grooming, and that she needed to set an alarm as a reminder to take medicine. Id. at 342.   She stated that she prepared her own meals such as frozen dinners, and that she was able to do household chores such as cleaning and laundry, which she did once a week and it took her the whole day, but she did not need help to do these things.  Id.

Claimant stated that she went out every day to go to group therapy and was able to drive a car to get around.  Id. at 343.  She stated that she was able to count change but that she did not pay bills, have a savings account, or use money orders.  Id.  She stated that her ability to handle money had not changed since her illness began.  Id. at 344.  She stated she enjoyed reading and writing and that she did these things daily, and that she started doing these activities when her illness began.  Id.

Claimant stated that she went to group therapy daily from Monday to Friday, and she did not need to be reminded or need anyone to go with her.  Id.  She reported that she did not like to be alone with her family and that she disliked having people around her.  Id. at 345.  She stated that her conditions affected her talking, memory, completing tasks, concentration, understanding,

and ability to follow instructions and getting along with others.  Id.  She stated that she got nervous talking to people because of problems with her memory, understanding, and ability to follow instructions.  Id.  She stated that she was able to walk a mile before needing to stop and rest; that she could only pay attention for five minutes; that she could follow written instructions well, but that she had problems with spoken instructions.  Id.  She stated that she could get along with authority figures well; that she handled stress by reading or writing; that she had to do the same things daily; and that she feared losing her self-control easily.  Id. at 346.  Claimant stated that she took medications and they did not cause any side effects.  Id. at 347.

### HEARING TESTIMONY

A hearing was held on January 22, 2019, before ALJ Leibowitz, at which Claimant and VE Salek testified.  Id. at 40-65.

**I.      Claimant**

Claimant testified that she was 53 years old at the time of the hearing.  Id. at 45.  She was divorced and lived with her 17-year-old son in an efficiency that was a part of her mother's house.  Id.  Claimant stated that she had finished tenth grade in Cuba.  Id. at 46.  Her last jobs were housecleaning and running errands for her sister's business.  Id. at 46-48.  Her duties while working for her sister's business included making deposits, picking up or delivering documents, and filing things away.  Id. at 48.  Claimant testified that she had not worked since August 5, 2016, when she had started receiving psychiatric treatment.  Id.  at 49.  Her symptoms were crying spells, not wanting to go out, not wanting to shower or caring how she looked, and insomnia.  Id.  Claimant stated that she used to enjoy taking walks but did not do it anymore; she did not enjoy going to public places because she would get panic attacks; however, she acknowledged that she went on a cruise for her father's birthday and she had a good time.  Id. at 50-51.

Claimant testified that her mother made sure she was compliant with her medication.  Id. at 52.  She stated that sometimes her legs became weak as a side effect of her medications, and she would have to be careful getting up in the middle of the night.  Id. at 52.

Claimant stated that on a normal day, she watched tv and went to bed, but on the day before the hearing, she had watched her 5-year-old grandson and played with him while her daughter ran errands.  Id. at 54-55.   She stated she was able to do some cleaning, such as cleaning the toilet and the shower, and that she had a driver's license and drove to her psychiatrist and the grocery store; however, she stated that she did not like to drive in traffic because she got panic attacks.  Id. at 56. Claimant stated that she believed she could not work a full-time job because she was always crying and she did not have any motivation.  Id. at 58.  Claimant stated she had a problem with her son when he told her he was gay, and this was traumatic for her.  Id. at 59.  She also stated that she had been sexually abused when she was six years old.  Id.

**II.     VE Salek**

VE Salek classified Claimant's prior work as follows:

➢ Office messenger, DOT #239.567-010,[5] with an exertional level of light[6] and a Specific Vocational Preparation (hereafter, "SVP") of 2;[7]

---

[5] DOT is the acronym for the Dictionary of Occupational Titles, which was created by the Employment and Training Administration and groups of jobs based on their similarities, and defines the structure and content of all listed occupations.   See Dictionary of Occupational Titles app. c (4th ed., rev. 1991), http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTAPPC.HTM.

[6] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time."  20 C.F.R. §§ 404.1567(a) and 416.967(a).

[7] SVP is defined in the DOT as "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation."   See Dictionary of Occupational Titles app. c (4th ed., rev. 1991), http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTAPPC.HTM.
An SVP of 2 means that preparation for the job should take "[a]nything beyond short demonstration up to and including 1 month."  Id.

<u>Id.</u> at 61.

ALJ Leibowitz posed to VE Salek two hypotheticals for an individual of Claimant's age, with her education and work experience who:

1) was able to work with no exertional limitations; except that the individual would be limited to simple, routine, and repetitive tasks, but not at a production rate pace such as piece work or assembly line work, and requiring occasional interaction with the public, co-workers, and supervisors.  (Hypothetical No. 1).

2) had the same abilities as the individual in Hypothetical No. 1; except that the individual would be off task for 20 percent of the workday. (Hypothetical No. 2).

<u>Id.</u> at 61-62.

VE Salek testified that the individual in Hypothetical No. 1 would be able to perform Claimant's past work.  VE Salek testified that the individual in Hypothetical No. 1 could also perform the following jobs:

➢ Laundry worker, DOT #361.684-014, with an exertional level of medium and an SVP of 2, with 250,000 jobs in the national economy;

➢ Kitchen helper, DOT #318.687-010, with an exertional level of medium and an SVP of 2, with 500,000 jobs in the national economy; and

➢ Hospital cleaner, DOT #323.687-010, with an exertional level of medium and an SVP of 2, with 200,000 jobs in the national economy.

<u>Id.</u>

VE Salek testified that the individual in Hypothetical No. 2 would not be able to maintain a job because typically the maximum time an individual could be off task is approximately 15%, and anything in excess of that would be job prohibitive.  <u>Id.</u> at 62.

## **STANDARD OF REVIEW**

A federal court's "review of a social security case is demarcated by a deferential reconsideration of the findings of fact and exacting examination of the conclusions of law."

Williams v. Astrue, 416 F. App'x 861, 862 (11th Cir. 2011).  Thus,

> [t]he Commissioner's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla—i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.

Kieser v. Barnhart, 222 F. Supp. 2d 1298, 1305 (M.D. Fla. 2002) (citations omitted).  However, the Commissioner's "conclusions of law, including applicable review standards, are not presumed valid."  Williams, 416 F. App'x at 862.

### REGULATORY FRAMEWORK:  THE FIVE-STEP SEQUENTIAL PROCESS

The Social Security Regulations outline a five-step "sequential" evaluation process used to determine whether a claimant is disabled.

First, the ALJ must determine whether a claimant is engaged in "substantial gainful activity" (hereafter, "SGA").  If the ALJ finds that the claimant is engaging in SGA, then the ALJ must find that the claimant is not disabled.  Phillips v. Barnhart, 357 F.3d 1232, 1237 (11th Cir. 2004).  In this case, ALJ Leibowitz determined that Claimant had not engaged in substantial gainful activity since August 5, 2016, the alleged onset date.  T.R. 23.

At the second step, the ALJ must determine if a claimant's impairments are "medically severe."  If the ALJ determines that the claimant's impairments are medically severe, then he or she must proceed to the third step.  Phillips, 357 F.3d at 1237.  In this case, ALJ Leibowitz found that Claimant suffered from the following severe impairments: major depressive disorder, co-dependent personality disorder, PTSD, schizoaffective disorder, and general anxiety disorder.  TR.

23.[8]  ALJ Leibowitz then proceeded to step three.  Id. at 24.

At step three, the ALJ must determine if a claimant's impairment(s) "meet or equal" any of the listed impairments in the regulations.  Phillips, 357 F.3d at 1238.  If so, the ALJ must find the claimant disabled; if not, then the ALJ should proceed to step four.  Id.  Here, ALJ Leibowitz determined that Claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.  TR. 24.  Therefore, ALJ Leibowitz proceeded to step four.  Id. at 27.

Step four is a two-pronged process, which first requires the determination of a claimant's RFC and then, based on that RFC, a determination of whether the claimant can return to any "past relevant work."  Phillips, 357 F.3d at 1238.  As to the first prong, ALJ Leibowitz determined that Claimant had the RFC:

> to perform a full range of work at all exertional levels, limited to: simple, routine, repetitive tasks but not at a production rate pace such as piece work or assembly line work; and occasional interactions with supervisors, coworkers, and the public.

TR. 27.  Based on Claimant's RFC, ALJ Leibowitz moved to prong two of step four and concluded that Claimant was able to perform past relevant work.  Id. at 30.[9]  Notwithstanding this conclusion, ALJ Leibowitz also proceeded to the fifth and final step.  Id. at 31.

Step five requires the ALJ to determine whether the claimant is able to do any work considering the claimant's age, education, work experience, and RFC.  Phillips, 357 F.3d at 1239-40.  ALJ Leibowitz determined that, given Claimant's age, education, work experience and RFC,

---

[8]   ALG Leibowitz also found that Claimant had the following non-severe physical impairments: hypertension, sleep apnea, thyroid disorder, hyperlipidemia, and obesity.  Id. at 24.  As previously noted, however, Claimant's counsel has stipulated that this is exclusively a psychiatric case.
[9]   Usually, the determination that Claimant was able to perform past relevant work would be the end the inquiry in the sequential evaluation process.  20 C.F.R. § 404.1520(a)(4)(iv) & (f).

there were jobs that existed in significant numbers in the national economy which Claimant could perform.  TR. 31.

Therefore, ALJ Leibowitz concluded that Claimant was not under a disability, as defined in the Social Security Act, from August 5, 2019, through the date of the Unfavorable Decision.  Id. at 32.

## DISCUSSION

As noted above, Claimant argues that:

I.      The ALJ failed to properly assess the opinion evidence of record.

II.     The ALJ's RFC finding was not supported by substantial evidence.

III.    The ALJ failed to properly assess Claimant's alleged symptoms and limitations.

See Claimant's Motion for Summary Judgment [D.E. 19].  The undersigned finds no merit in any of the contentions.

**I.      Whether the ALJ failed to properly assess the opinion evidence of record.**

Because Claimant applied for benefits after March 27, 2017, the ALJ applied a new set of regulations for evaluating medical opinions and prior administrative medical findings, as set forth in 20 C.F.R. §§ 404.1520c, 416.920c.  Under the revised regulations, evidence from Federal and State agency medical and psychological consultants is categorized as "prior administrative medical findings" rather than medical opinions.  20 C.F.R. §§ 404.1513(a)(5), 416.913(a)(5).  The SSA "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources."  20 C.F.R. §§ 404.1520c(a), 416.920c(a).  However, "[w]hen a medical source provides one or more medical opinions or prior administrative medical findings, [the SSA] will consider those medical opinions or prior administrative medical findings from that medical source together using the factors listed in paragraphs (c)(1) through (c)(5) of this section,

as appropriate." Id.  The factors are: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors.   20 C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c).  The most important factors the SSA considers when it evaluates the persuasiveness of medical opinions and prior administrative medical findings are supportability and consistency.   20 C.F.R. §§ 404.1520c(b), 416.920c(b).  The ALJ must explain in his or her decision how persuasive the ALJ finds a medical opinion or prior administration medical finding based on these two factors. Id.  The ALJ may, but is not required to, explain how he or she considered the other remaining factors.  Id.  "Administrative law judges are not required to adopt any prior administrative medical findings, but they must consider this evidence . . . because our Federal or State agency medical or psychological consultants are highly qualified and experts in Social Security disability evaluation." 20 C.F.R. §§ 404.1513(b)(1), 416.913(b)(1).

Claimant argues that the ALJ only cited benign findings to the exclusion of clinically significant findings, and therefore improperly assessed Dr. Matus de la Parra's opinion as inconsistent.  See Plaintiff's Motion for Summary Judgment [D.E. 19 at 4].  Specifically, Claimant argues that the limitations articulated by Dr. Matus de la Parra are reasonable based on her treatment notes.  Id.

Dr. Matus de la Parra opined that Claimant did not have the ability to deal with the public or stress, had poor ability to relate to co-workers, interact with supervisors, function independently, or maintain attention/concentration, and that her ability to understand, remember, and carry out simple instructions was fair.  TR. 30.  ALJ Leibowitz found that Dr. Matus de la Parra's opinion was not persuasive and was inconsistent and unsupported by the medical evidence of record as well as the doctor's own medical records, because Claimant's medical record showed generally benign mental status exams.  Id. at 29.  ALJ Leibowitz explained:

> [Dr. Matus de la Parra's] own treatment notes reflect that at her appointment she was generally awake, alert, and oriented x3, casually dressed, well groomed, no abnormal involuntary movements, her speech was normal, her thought process was goal orientated, she had no auditory or visual hallucinations, no ideas of reference, no suicidal or homicidal ideation, intent or plan. Indeed, he noted that her immediate, recent, and remote memory were good.

Id. at 30 (internal citations omitted).

ALJ Leibowitz also found Dr. Matus de la Parra's opinion inconsistent with other evidence, and noted that other treaters, such as Dr. Martinez and Jose Pagliery, M.D. ("Dr. Pagliery"), Claimant's primary care physician at Citrus, described Claimant as cooperative and agreeable. Id.

ALJ Leibowitz found the opinions of Dr. Bee and Dr. Plasay, the State agency psychologists, persuasive because they were consistent with the overall record and testimony at the hearing, which indicated generally benign findings, demonstrated improvement with treatment, and admitted medication noncompliance; and because Dr. Bee and Dr. Plasay were familiar with the SSA's disability program. Id. at 29. Dr. Bee and Dr. Plasay opined that Claimant had no more than moderate limitations and could understand, retain, and carry out simple and some complex instruction, and was capable of attention and concentration on at least simple routine tasks for at least two hours at a time, and able to perform activities within a schedule, maintain regular attendance, and be punctual without customary tolerances. Id. ALJ Leibowitz cited to record evidence indicating that Claimant was cooperative, agreeable, had intact memory, good attention and concentration, normal thought process, and intact insight and judgment. Id.

Thus, ALJ Leibowitz properly assessed Dr. Matus de la Parra's opinion pursuant to 20 C.F.R. §§ 404.1520c, 416.920c, and ALJ Leibowitz's determinations were sufficiently supported by substantial evidence. See Strickland v. Comm'r of Soc. Sec., 516 F. App'x 829, 831 (11th Cir. 2013) ("We may not reweigh the evidence and decide facts anew and must defer to the ALJ's decision if it is supported by substantial evidence even if the evidence may preponderate against

it.") (citing <u>Dyer v. Barnhart</u>, 395 F.3d 1206, 1211 (11th Cir. 2005)).  Therefore, the undersigned finds no error in the ALJ's assessment of the opinion evidence of record.

**II.        Whether the ALJ's RFC assessment was supported by substantial evidence.**

"The RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis."  SSR 96-8p.[10]  Further, "[t]he RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)."  <u>Id.</u>  "In all events, there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision, so long as the ALJ's decision is not a broad rejection which is 'not enough to enable the district court or this Court to conclude that the ALJ considered her medical condition as a whole.'"  <u>Dyer v. Barnhart</u>, 395 F.3d 1206, 1211 (11th Cir. 2005) (alterations omitted) (quoting <u>Foote v. Chater</u>, 67 F.3d 1553, 1561 (11th Cir. 1995)).  The ALJ's "opinion must describe his analysis with enough detail to satisfy a reviewing court that he gave all of the relevant evidence before him its due regard."  <u>Turner ex rel. Turner v. Barnhart</u>, 377 F. Supp. 2d 1165, 1168 (M.D. Ala. 2005).  When substantial evidence supports the ALJ's decision, it must be affirmed.  <u>Strickland</u>, 516 F. App'x at 831.

First, Claimant argues that the ALJ's assessment of Claimant's RFC did not contain all of the limitations articulated by Dr. Matus de la Parra.  <u>See</u> Claimant's Motion for Summary Judgment [D.E. 19 at 12-13].  However, as previously discussed, the ALJ's finding that Dr. Matus de la Parra's opinion was unpersuasive is supported by substantial evidence.

---

[10] SSR 96-8p sets forth the SSA's policies and policy interpretations regarding the assessment of a claimant's RFC.  SSR 96–8p, 1996 WL 374184 (July 2, 1996).  According to this policy interpretation, the Commissioner is required to consider all relevant evidence in the case record in making the RFC determination.  <u>Id.</u>; <u>see</u> also <u>Lewis v. Callahan</u>, 125 F.3d 1436, 1440 (11th Cir. 1997) ("The [RFC] is an assessment, based upon all of the relevant evidence, of a claimant's remaining ability to do work despite his impairments.") (citing 20 C.F.R. § 404.1545(a)).

Next, Claimant argues that the ALJ's assessment of Claimant's RFC did not contain all of the limitations articulated by Dr. Bee and Dr. Plasay.  Id. at 12-13.  Claimant points to particular statements in the state agency psychologists' opinions and argues that those should have been incorporated into the RFC.  Id.  However, the ALJ is not required to incorporate every part of the state agency psychologists' opinions into the RFC; the issue is whether substantial evidence supports the ALJ's decision.  See Dyer, 395 F.3d at 1211 ("[T]here is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision, so long as the ALJ's decision is not a broad rejection which is 'not enough to enable the district court or this Court to conclude that the ALJ considered her medical condition as a whole.'").

In her discussion of Claimant's RFC, ALJ Leibowitz explained that she "considered all symptoms and the extent to which [those] symptoms [could] reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and 416.929 and SSR 16-3p"; and that she "also considered the medical opinion(s) and prior administrative medical finding(s) in accordance with the requirements of 20 CFR 404.1520c and 416.920c."  TR. 27.  As previously noted, ALJ Leibowitz found that Claimant had the RFC to:

> perform a full range of work at all exertional levels, limited to: simple, routine, repetitive tasks but not at a production rate pace such as piece work or assembly line work; and occasional interactions with supervisors, coworkers, and the public (See SSR 16-3p and 20 C.F.R. §§ 404.1529 and 416.929).

Id. at 27.  ALJ Leibowitz articulated her rationale for this conclusion as follows:

> The medical record indicates the claimant was diagnosed [with] major depression with psychotic feature.  However, the record is significant for generally benign mental status examinations.  Moreover, the claimant admitted to medication non-compliance.  Additionally, no evidence of any psychiatric hospitalization during the relevant time-period was found.  The claimant's continued engagement in a variety of [activities of daily living], including independent dressing and grooming,

cooking, cleaning, shopping, driving, going on family vacation, watching television, and taking care of her family belie the degree of severity alleged. (Ex. 4E; 2F; 5F; 9F; Hearing Testimony).

Nothing in the clinical signs suggests that the above residual functional capacity assessment is unreasonable. Nor does the medical record reflect a treatment regimen inconsistent with such limitations. Therefore, I find that the claimant retains the ability to perform the work related functions as outlined.

Id. at 29.

Next, Claimant argues that ALJ's RFC assessment failed to account for Dr. Bee and Dr. Plasay's opinions that Claimant had moderate limitations with regard to concentration, persistence, and maintaining pace. See Claimant's Motion for Summary Judgment [D.E. 19 at 13]. Claimant relies on Samuels v. Acting Comm'r of Soc. Sec., 959 F.3d 1042, 1047 (11th Cir. 2020), for the proposition that limiting the RFC to simple work and occasional interaction with the public was not enough to accommodate the claimant's limitations from bipolar disorder. However, in Samuels, the SSA had determined that claimant was disabled, and the hearing before the ALJ was only to determine the disputed onset date; and the State agency psychologist opined that many of her abilities were "markedly limited". Id. In contrast, the State agency psychologists both opined that Claimant had no more than moderate limitations in any area, and that she was capable of simple, routine tasks.

Substantial evidence in the medical record supports ALJ Leibowitz's findings that Claimant could perform simple, routine tasks despite her moderate limitations in concentration, persistence, and pace. The ALJ conducted a detailed discussion and analysis of Claimant's medical record, id. at 27-30, and concluded that it revealed generally benign mental status exams. Id. at 29. Additionally, the record showed that Claimant continued to engage in a variety of activities of daily living, including independent dressing and grooming, cooking, cleaning, shopping, driving, going on a family vacation, watching television, and taking care of her family.

Id. at 25.  Furthermore, ALJ Leibowitz found Dr. Bee and Dr. Plasay's opinions that Claimant was able to perform simple, routine tasks to be persuasive.

Finally, Claimant argues that the DOT reasoning level 2 jobs provided by the VE are inconsistent with the ALJ's RFC assessment that claimant could perform simple, routine tasks. See Claimant's Motion for Summary Judgment [D.E. 19 at 15-16].  Thus, Claimant argues the ALJ's reliance upon the VE's testimony to find that Claimant could perform her past relevant work, or other DOT reasoning level 2 jobs, was plain error.  Id. at 18.  Claimant cites to Nadile v. Saul, 2020 WL 1430701, at *4 (M.D. Fla. Mar. 24, 2020), where the court stated that it was not clear whether a person with mental limitations of simple, routine, repetitive tasks would be able to carry out DOT reasoning level 2 jobs, and noted that the Eleventh Circuit had yet to address this specific issue; but the court found that the ALJ erred by not addressing the apparent discrepancy and by not allowing the unrepresented claimant to meaningfully question the VE at the hearing. Id. at *5.  However, in a subsequent decision in Valdez v. Comm'r of Soc. Sec., 808 F. App'x 1005 (11th Cir. 2020), the Eleventh Circuit held that a limitation to simple, routine, and repetitive work is not inconsistent with DOT Reasoning level 2 work.  Id.  at 1009.

In Claimant's Reply, she argues that the holding in Valdez does not apply because the Eleventh Circuit did not use the term "tasks," but instead used the phrase "simple, routine, and repetitive work."  See Claimant's Reply [D.E. 26 at 2-3].  Claimant argues that there is ambiguity over what is meant by "work" which would require speculation, and argues that the Court should instead follow Nadile and other cases decided prior to Valdez.  Id. at 3-4.  Claimant's argument is nothing more than a distinction without a difference and fails to provide justification for adhering to an earlier, district level opinion in Nadile, as opposed to the later, Eleventh Circuit opinion in

_Valdez_.  Therefore, the ALJ's finding that Claimant could perform her past relevant work, or other DOT reasoning level 2 jobs, was not plain error.  _Valdez_, 808 F. App'x at 1009.

Because the ALJ's RFC assessment was supported by substantial evidence, there is no error in the ALJ's RFC assessment.  See _Strickland_, 516 F. App'x at 831.

### III.    Whether ALJ Leibowitz properly assessed Claimant's alleged symptoms and limitations.

When considering a claimant's symptoms, the ALJ must follow a two-step process: "Step one is to determine whether the individual has a medically determinable impairment that could reasonably be expected to produce the alleged symptoms."  _Contreras-Zambrano v. Soc. Sec. Admin., Comm'r_, 724 F. App'x 700, 703 (11th Cir. 2018) (citing SSR 16-3p, 82 Fed. Reg. 49,462, 49,463-64 (Oct. 25, 2017)).  "Step two is to evaluate the intensity and persistence of an individuals' symptoms, such as pain, and determine the extent to which an individual's symptoms limit her ability to perform work-related activities."  _Contreras-Zambrano_, 724 F. App'x at 703 (citing SSR 16-3p, 82 Fed. Reg. at 49,464-66).  "An ALJ considers whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between [the claimant's] statements and the rest of the evidence, including [her] history, the signs and laboratory findings, and statements by [her] medical sources or other persons about how [her] symptoms affect [her]."  20 C.F.R. § 404.1529(c)(4).  SSR 16-3p, effective October 25, 2017, clarified that "subjective symptom evaluation is not an examination of an individual's character."  82 Fed. Reg. at 49,463.

ALJ Leibowitz explained her assessment of Claimant's allegations of her symptoms and limitations as follows:

> [T]he claimant alleged in a May 2017 Function Report that she has memory problems and uses an alarm to remind her to take her medication.  However, at the hearing, the claimant generally exhibited no problem with understanding or remembering.  Indeed, she was able to identify her medications by name and provided a past work history.  Additionally, the claimant stated she prepared her

own simple meals, went grocery shopping, she is able to follow written instructions, and drives a car.

The claimant testified [she] could not be in places with many people because she gets panic attacks.  In the Function Report, she alleged she could not be along with her family.  However, the claimant also testified that [she] spent time with her grandchild, watched him the day before the hearing, and played games with him.  She also gook a cruise for her father's birthday in 2017 and testified that she enjoyed her time on the cruise.  Treatment notes in the record also documented that she went to New York to spend the holidays with her family.  Moreover, in the Function Report, she wrote that she gets along with authority figures.

The claimant testified [she] does not like to leave the house, does not care what she looks [like] or if she showers.  However, in the Function Report she stated that on a typical day she prepared her son to go to school, prepared his breakfast, lunch, and dinner. . . .  She was also able to go out alone to attend her therapy sessions.

TR. 25-26.

The ALJ then concluded:

After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limited effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

Id. at 27.

Because ALJ Leibowitz supported her findings regarding Claimant's allegations of the intensity, persistence, and limiting effects of her symptoms with substantial evidence, there is no error in the ALJ's assessment of Claimant's alleged symptoms and limitations.  See Strickland, 516 F. App'x at 831.

## **RECOMMENDATION**

Based on the foregoing considerations, the undersigned RESPECTFULLY RECOMMENDS that Claimant's Motion for Summary Judgment [D.E. 19] be DENIED, the

Commissioner's Motion for Summary Judgment [D.E. 23] be GRANTED, and the Commissioner's decision be AFFIRMED.

Pursuant to Local Magistrate Judge Rule 4(b), the parties have **fourteen days** from the date of this Report and Recommendation to file written objections, if any, with the Honorable Jose E. Martinez, United States District Judge.  Failure to file timely objections may bar the parties from attacking the factual findings contained herein on appeal.  See Resolution Tr. Corp. v. Hallmark Builders, Inc., 996 F.2d 1144, 1149 (11th Cir. 1993).  Further, "failure to object in accordance with the provisions of [28 U.S.C.] § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions."  See 11th Cir. R. 3-1 (I.O.P. - 3).

RESPECTFULLY SUBMITTED in Chambers at Miami, Florida, this 19th day of February, 2021.

ALICIA M. OTAZO-REYES
UNITED STATES MAGISTRATE JUDGE

cc:    United States District Judge Jose E. Martinez
       Counsel of Record